**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LYNN HEJKA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 12 CV 9993** |
| **v.** | ) | |
| | ) | **Honorable Michael T. Mason** |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Claimant Lynn Hejka ("claimant" or "Hejka") brings this motion for summary judgment seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), denying Hejka's claim for disability insurance benefits under the Social Security Act (the "Act"), 42 U.S.C. §§ 416(1) and 423(d).  The Commissioner filed a response asking the Court to uphold the decision of the Administrative Law Judge ("ALJ").  This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g).  For the reasons set forth below, claimant's motion for summary judgment or remand [26] is granted.

**I.     BACKGROUND**

**A.     Procedural History**

On May 18, 2010, Hejka filed a Title II application for a period of disability and disability insurance benefits, alleging disability beginning May 1, 2009 due to panic

disorder with agoraphobia and major depression.[1]  (R. 58, 62, 137-138.)  Her

application was denied initially on September 14, 2010, and again on reconsideration on

January 6, 2011.  (R. 58, 84.)  Hejka filed a timely request for a hearing.  On July 8,

2011, she appeared with counsel for a hearing before ALJ Marceille.  (R. 27.)  On July

22, 2011, ALJ Marceille issued a written decision denying Hejka's request for benefits.

(R. 13-22.)  Hejka filed a timely request for review with the Appeals Council on August

29, 2011.  (R. 8-9.)  On September 10, 2012, the Appeals Council denied that request,

making the ALJ's decision the final decision of the Commissioner.  (R. 2-7.)  This action

followed and the parties consented to the jurisdiction of this Court [14].

### B.    Medical Evidence

#### 1.    Treating Physicians

Although Hejka's application contains a date of onset of May 1, 2009, her

medical records date back to 1994 for treatment for depression and anxiety.[2]  (R. 285.)

As early as 1994, she was prescribed antidepressants and antianxiety medication such

as Elavil.  (*Id.*)  Her medical records from 1994 until 2009 include therapy notes from

ABLC Associates in Psychiatry, Linden Oaks Hospital Outpatient Services, and DuPage

Mental Health Services.  (R. 298, 300, 302.)  She also attended regular therapy

sessions with Dr. Fatima Ali.  (R. 292-341.)  In March 2006, she had a psychiatric

evaluation after being admitted to Linden Oaks Hospital for "significant depression and

self-destructive thoughts."  (R. 316.)

---

[1] Claimant also applied for Supplemental Security Income, which was denied on June 24, 2010 because she was found to have too much income to be eligible.  (R. 65.)  It appears that claimant did not appeal this decision.
[2] A number of the records are handwritten and illegible.

On August 12, 2009, Dr. Ali documented that Hejka was having difficulty sleeping and under a lot of stress, due in part to an upcoming court date for her daughter. (R. 227.) Dr. Ali saw Hejka a month later, at which time she noted that Hejka was depressed, but that the medication helped her cope. (R. 226.) On November 6, 2009, Dr. Ali documented that Hejka reported experiencing mood swings prior to her change in medicine. (R. 225.) At the time, Hejka was on Lorazepam, Seroquel, Cymbalta, Zoloft, Ativan, Elavil, and Lunesta. (R. 226, 232.) On January 1, 2010, Dr. Ali referred her to see another doctor. (*Id.*)

Hejka went to the Prizm Behavioral Services clinic on January 28, 2010 and was seen by psychiatrist Dr. Asmat Jafry. (R. 241.) Dr. Jafry documented that Hejka had "lots of depression and anxiety," and was hospitalized four years earlier for depression because she "bottomed out." (R. 242.) At the time of her evaluation, Hejka described her anxiety as between an 8 or 9 out of 10. (*Id.*) Her depression was a 3 out of 10. (*Id.*) She stated that she was an emotional eater and a mess about her weight, which was 291 pounds (she was 5'6"). (*Id.*) She reported that she was seeking a divorce from her husband, who was mentally abusive, and had started to live with her sister two weeks ago. (R. 242-43.) Her sleep was poor, but Lunesta helped. (R. 244.)

Dr. Jafry saw Hejka on March 2, 2010, at which time she reported that she was sad, anxious, and moody. (R. 250.) She had increased depression and anxiety, severe mood swings, and was withdrawn and quiet. (*Id.*) She reported stress from her divorce as well as financial stress. (*Id.*) She was worried her medications were not working and feared decompensation. (*Id.*) She also underwent a comprehensive assessment by a nurse, at which time she reported just getting her panic attacks under control with her

medications. (R. 371.) She was not keeping up with her activities of daily living. (R. 373.)

Hejka underwent a psychiatric evaluation at Linden Oaks Hospital on March 5, 2010. (R. 237.) Dr. Jafry was her attending physician. (*Id.*) She complained of an inability to function, crying spells, and worsening depression. (*Id.*) She reported staying in bed all day and being unable to move on with her life. (*Id.*) She was also afraid to change her medications because she had been on them for 17 years. (*Id.*) She was stressed about her children, her divorce to her verbally abusive husband, and her obesity. (*Id.*) Dr. Jafry described her as dysphoric looking, disheveled, with a flat affect and an inability to function. (R. 238.) Dr. Jafry advised her to continue her medications, with some possible changes to be made, and attend individual, group and family therapy. (*Id.*)

On March 29, 2010, Hejka was admitted to Linden Oaks Hospital's partial hospitalization program due to depression, anxiety, and an inability to function. (R. 236.) She requested a "medication wash off" of Amitriptyline because it caused her to gain weight. (*Id.*) She continued her other medications of Zoloft, Cymbalta, Ambien, Ativan, Seroquel, Topamax, and Wellbutrin. (*Id.*) Dr. Jafry commented that most of her issues revolved around her difficulty with her pending divorce. (*Id.*) She was safe to return to outpatient care on April 2, 2010 once there were no concerns of suicidal or homicidal thoughts. (*Id.*) She was advised to continue outpatient therapy with Dr. Jafry and see her therapist. (*Id.*)

She was seen by Dr. Jafry on May 4, 2010, who noted that her mood and anxiety were "going well." (R. 249.) She liked the way the medications were working and was

able to take care of herself.  (*Id.*)  On July 22, 2010, Hejka told Dr. Jafry that she filed for divorce and was living with her father and daughter.  (R. 251.)  Although she continued to struggle with anxiety and mood issues, she felt better than before, and they discussed tapering off Cymbalta.  (*Id.*)  On August 2, 2010, Dr. Jafry authored a letter for the Social Security Administration to consider along with Hejka's disability application and explained that Hejka began treatment at her clinic on January 28, 2010. (R. 241.)  She continued to follow up regularly.  (*Id.*)  Dr. Jafry found that Hejka had the following diagnoses:  Axis I: major depressive disorder, recurrent severe, generalized anxiety disorder; Axis II: deferred; Axis III: migraines, obesity; Axis IV: marital issues, financial issues, health issues; Axis V: 40 GAF score.  (*Id.*)  She was prescribed Zoloft, Seroquel, Wellbutrin, Cymbalta, Ativan, and Topamax.  (*Id.*)  Dr. Jafry explained that she continued to struggle with mood and severe anxiety issues that impaired her ability to function and asked the reader to consider the diagnosis while determining her eligibility for disability.  (*Id.*)

### 2. Agency Consultants

Dr. John Brauer, clinical psychologist, interviewed Hejka on September 8, 2010 and prepared a Report of Disability Evaluation.  (R. 255.)  At the time of her interview, she lived with her sister, daughter, and nephew.  (R. 256.)  She did not work, but reported doing housework and some cooking.  (*Id.*)  She did not have any hobbies or interests.  (*Id.*)  Dr. Brauer described her affect as depressed.  (R. 257.)  Her concentration and attention were within normal limits; her general fund of knowledge was grossly intact; and her capacity for abstraction was reasonably well developed. (*Id.*)  Hejka described a history of anxiety and panic attacks dating back 17 years, with

attacks occurring daily at the time of the interview.  (R. 258.)  Dr. Brauer diagnosed her with panic disorder with agoraphobia and major depression.  (*Id.*)  He also found that she would be able to manage funds on her own behalf if they were granted to her.  (*Id.*)

On September 13, 2010, Dr. Jerrold Heinrich performed a psychiatric review.  (R. 259.)  He documented a diagnosis of major depressive disorder, generalized anxiety disorder, and panic disorder with agoraphobia.  (R. 262, 264.)  Her affective disorders included sleep disturbances and decreased energy.  (R. 262.)  According to Dr. Heinrich, she had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration.  (R. 269.)  Dr. Heinrich did not find that the evidence established the presence of category C criteria.  (R. 270.)

In his Mental Residual Functional Capacity Assessment, Dr. Heinrich noted that Hejka was behaviorally limited by depression symptoms and that her allegations were supported by available evidence.  (R. 275.)  He found her statements to be credible. (*Id.*)  Her basic reality testing and cognitive functioning were found to be sufficiently adequate for day-to-day tasks.  (*Id.*)  Her activities of daily living were also noted to be intact and she was found to be able to complete essential activities.  (*Id.*)  According to Dr. Heinrich, she could understand, remember, and execute simple instructions consistently; could concentrate and persist adequately on tasks within an organized setting; would adapt to a low-stress job where speed or performance was not essential; and she could adjust to routine changes in her environment as long as they were not too frequent.  (*Id.*)  He found that while her basic social skills were adequate, she lacked

the temperament to cope with frequent interactions with others.  (*Id.*)  Dr. Russell

Taylor, a State agency psychologist, reviewed the record in January 2011 and affirmed

the initial determination.  (R. 277-80.)

### C.    Claimant's Testimony

Hejka appeared with counsel at the hearing before the ALJ on July 8, 2011 and

testified as follows.  At the time of the hearing, Hejka was 43 years old and residing with

her sister.  (R. 30, 32.)  She was going through a divorce and her daughter, who

suffered from depression and truancy problems, lived with her father.  (R. 32-33.)  She

testified that she did not notice any improvement when she separated from her

husband.  (R. 39.)  She did not have any physical problems.  (*Id.*)

Hejka testified that she was fired from her position as a special education

assistant teacher in May of 2009 for missing too many days of work.[3]  (R. 30 and 42).

She had a feeling of dread about three times a week and was sometimes unable to get

out of bed.  (R. 42.)  According to her, the school put up with her absences at first

because not many people wanted the difficult job.  (*Id.*)  She was, however, supposed to

work forty hours a week and was eventually reprimanded in May of 2009 and officially

fired in August 2009.  (R. 39, 42.)  She did not receive any income from the school

during the summer of 2009.  (R. 40.)

At the time of the hearing, she was collecting $1,022 a month in unemployment

benefits.  (R. 30-31.)  She was on her last extension for unemployment.  (R. 31.)  She

applied for a variety of jobs, mostly in retail.  (*Id.*)  When asked whether she would have

been able to work if she was hired, she testified that she would have tried.  (R. 32.)  She

---

[3] When questioned again, Hejka testified that she was laid off, not fired.  (R. 32.)  Her attorney clarified
the matter and said she was fired.  (*Id.*)

could anticipate having problems with being around other people, whether they were customers or coworkers.  (R. 43.)  She had difficulty with coworkers at her last job and would go home as a result.  (R. 43-44.)  She had a fear that she would have similar problems with people at a new job.  (R. 45-46.)  When asked why she felt she was unable to work, she testified that she became overwhelmed and could not get out of bed.  (R. 33.)  If she did get to work, she was not able to stay the whole day.  (*Id.*)

Hejka explained that she did not leave her home if it was not necessary.  (R. 34.) She usually left the house at least twice a week, but sometimes panic attacks prevented it.  (R. 48.)  The panic attacks were due to various stressors, such as her divorce or if a neighbor wanted to visit.  (*Id.*)  The attacks occurred daily and caused dizziness as well as a "fight or flight" feeling where she felt she had to leave the current situation immediately.  (R. 33.)  She experienced panic attacks at the store, which resulted in her leaving without her groceries.  (R. 41.)  The attacks came suddenly and could not be anticipated.  (*Id.*)  She did not usually go to the store; if she did, her dad went to help her "get through it."  (R. 34.)  She testified that she depended on her father a lot to help her.  (R. 40.)

She had not attended church since she was a kid.  (R. 34.)  When asked about the fact that her disability report indicated that she went to church on a regular basis, tried to help at the American Cancer Society, and shopped for groceries a few hours as needed, she explained that her activities changed because she started to get worse. (R. 34-35.)  She still tried to volunteer at the American Cancer Society Relay for Life once a year.  (R. 35.)  She vacuumed, dusted, washed dishes, did laundry, and drove. (R. 35-36.)  Even though she tried to cook, she needed help because she was forgetful

and needed to be reminded to shut off the stove.  (R. 35.)  Hejka's daily routine was generally to get up, get dressed, and sit, usually in the smoking room so she could have a cigarette.  (R. 44-45.)  She did not read or watch TV because she was unable to concentrate and had no interest in the TV programs.  (*Id.*)  She showered every three days.  (R. 46.)

At the time of her testimony, Hejka was taking the following medications for depression, anxiety, and sleep: 120 mg of Cymbalta, 150 mg of Seroquel, 150 mg of Bupropion, 200 mg of Seroquel, 100 mg of Topriam, and 250 mg of Citrulline.  (R. 36.)  They helped a little, but also made her sleepy.  (*Id.*)

Hejka testified that she had a lot of memory problems.  (R. 47.)  She noticed the problems more recently as they worsened.  (*Id.*)  Dr. Jafry told her that the medications should not affect her memory.  (*Id.*)

Hejka was hospitalized at Linden Oaks for anxiety in March of 2010, but she had not been hospitalized since then.  (R. 36-37.)  She was seeing Dr. Jafry, who switched medications from those prescribed by her old psychiatrist, Dr. Fatima Ali.  (R. 37.)  At the time of her testimony, Hejka saw Dr. Jafry every three months for medication management, unless Dr. Jafry told her to come sooner.  (R. 37-38.)  Therapy was recommended, but Hejka could not afford it.  (R. 38.)

Hejka testified that she had been on medication for the better part of 17 years.  (*Id.*)  When asked what changed to make her condition disabling, she explained that she was a stay-at-home mom for years and when she tried working as a teacher's aide in special education, she was not able to go to work regularly.  (R. 38-39.)

### D. Vocational Expert's Testimony

Vocational expert ("VE") Edward Pagella also testified at the hearing. The ALJ first asked the VE to classify Hejka's past work. (R. 52.) Pagella explained that Hejka previously worked as a sales clerk (low end semi-skilled/light) and teacher's aide (semi-skilled/light). (*Id.*)

Next, the ALJ asked the VE to consider a hypothetical individual of the claimant's age, education, and past work experience. (*Id.*) The individual had no exertional limitations, but due to moderate restrictions in concentration and pace, the individual was limited to simple, routine, and repetitive work involving only occasional workplace changes and decision making. (R. 53.) On the basis of moderate restrictions in social functioning, the individual could occasionally interact with coworkers, supervisors, and the public. (*Id.*) The VE testified that the hypothetical individual would be unable to perform claimant's past relevant work, but she could perform at the light level of physical tolerance such as a hand packer (4,700 jobs in Chicago), an assembler (5,600 jobs), or a hand sorter (2,800 jobs). (*Id.*)

The ALJ then asked if such an individual would be able to perform those jobs if she missed three days a week. (*Id.*) The VE testified that there would be no work available for that hypothetical individual. (*Id.*) According to the VE, an individual is only allowed to miss one and three-quarters a day per month in those positions. (*Id.*)

Upon questioning by claimant's counsel, the VE testified that there could be a problem in performance if a person could not sustain the pace, concentration, and persistence at an 85 percent level. (R. 54.) The VE further testified that if an individual

suffered from panic attacks and had to leave work without notice or advance scheduling every few days, she would be terminated.  (R. 54-55.)

## II.    LEGAL ANALYSIS

### A.    Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).  Substantial evidence is greater than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir.1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)).  We must consider the entire administrative record, but will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner."  *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).  This Court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues."  *Lopez*, 336 F.3d at 539 (quoting *Steele*, 290 F.3d at 940).

In addition, while the ALJ "is not required to address every piece of evidence," she "must build an accurate and logical bridge from the evidence to [her] conclusion."  *Clifford*, 227 F.3d at 872.  The ALJ must "sufficiently articulate her assessment of the evidence to assure us that the ALJ considered the important evidence...[and to enable] us to trace the path of the ALJ's reasoning."  *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir.1985)).

**B.      Analysis under the Social Security Act**

In order to be entitled to disability insurance benefits, a claimant must be disabled under the Social Security Act (the "Act").  A person is disabled under the Act if he or she has the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy."  *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  The claimant has the burden of establishing a disability at steps one through four.  *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001).  If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy."  *Id.* at 886.

ALJ Marceille applied this five step analysis.  At step one, the ALJ found that Hejka had not engaged in substantial gainful activity since May 1, 2009, the alleged onset date.  (R. 15.)  At step two, the ALJ found that Hejka had severe impairments of major depressive disorder, recurrent; generalized anxiety disorder; and panic disorder with agoraphobia.  (*Id.*)  Next, at step three, the ALJ determined that Hejka did not have

an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (R. 15-17.)

The ALJ went on to assess Hejka's RFC, ultimately concluding that she can perform a full range of work at all exertional levels, except that she is limited to simple, routine, and repetitive work due to moderate restriction in concentration, persistence, or pace. (R. 17-21.) Additionally, the ALJ found that the work should only involve occasional decision-making and occasional workplace changes as well as occasional interaction with coworkers, supervisors, and the public due to moderate restriction in social functioning. (*Id.*) Therefore, at step four, the ALJ then determined that Hejka is unable to perform her past relevant work as a teacher's aide and sales clerk. (R. 21.) At step five, however, the ALJ found that there are jobs that exist in significant numbers in the national economy that the claimant can perform considering her age, education, work experience, and residual functional capacity. (*Id.*) Specifically, the vocational expert testified that given all of claimant's factors, she would be able to perform the positions of a hand packer, assembler, and hand sorter. (*Id.*) The ALJ did not consider whether the jobs would be precluded if Hejka is unable to sustain concentration, persistence or pace at the 85 percent level because the ALJ did not find any basis for such a limitation based on the claimant's record. (R. 22.) As a result, the ALJ found that Hejka has not been under a disability, as defined in the Act, from May 1, 2009 through the date of the decision. (*Id.*)

Hejka now argues that the ALJ failed to (1) properly weigh the opinions of record; (2) make an accurate credibility determination; and (3) properly assess her RFC.

**C.     The ALJ Failed to Properly Weigh the Opinions of Record.**

Claimant argues that the ALJ committed reversible error when he failed to properly weigh the opinion of her treating psychiatrist, Dr. Jafry.  The Commissioner asserts that the ALJ's finding was supported by substantial evidence in the record.  We agree with the claimant.

A treating physician's opinion regarding the nature and severity of her patient's impairments is generally entitled to great weight.  20 C.F.R. § 416.927(c)(2).  According to SSR 96-2p, the treating physician's opinion is entitled to controlling weight when it is supported by medical findings and not inconsistent with the evidence of record.  *See* 20 C.F.R. § 404.1527(c)(2).  The non-examining, non-treating physician is less familiar with the other information in the case record; accordingly, less weight is afforded to her.  *See* 20 C.F.R. § 404.1527(c)(6); *see also Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) (finding that a contradictory opinion of a non-examining physician does not, by itself, suffice as a reason for the ALJ's rejection of an examining physician's opinion).

In this case, the ALJ relied heavily upon the State agency psychiatry consultant, Dr. Heinrich.  The ALJ discounted the validity of claimant's testimony as well as claimant's own treating psychiatrist.  Specifically, the ALJ rejected Dr. Jafry's opinion in her August 2010 letter because he found it inconsistent with the psychiatrist's treatment notes.  The ALJ relied on specific notes documenting an improvement in mood and the comments that claimant's divorce was very stressful in order to support his conclusion that her issues were not long-term.  However, the ALJ did not acknowledge that claimant was noted on multiple occasions to have suffered depression and anxiety for 17 years.  Medical records showing continuous treatment and medication support her

claims.  There were no indications in any of the records or interviews that anyone determined her condition to be temporary in nature.

The ALJ, however, determined that Dr. Jafry's previous progress notes implied that the claimant was now able to function and take care of herself.  Although Dr. Jafry noted improvements in claimant's mood, she never documented that claimant's depression and anxiety did not impair her ability to function.  The ALJ improperly made that inference based on his own assessment of the medical records.  *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992) (ALJ improperly substituted his own medical opinion for that of claimant's treating physicians).

The ALJ assumed that the claimant's condition was primarily related to her marital issues and began to improve once she sought a divorce.  While the records during the time at issue do attribute much of claimant's stress to her marriage and divorce, they do not infer that they are the sole reason for her problems.  She was still prescribed numerous depression and anxiety medications and encouraged to seek treatment, facts that the ALJ ignored in his assessment.  The ALJ also did not discuss the claimant's outpatient treatment records documenting her depression, anxiety, and inability to function.  The ALJ cannot selectively consider various treatment notes from the record without taking all of the records into consideration.  *Myles v. Astrue,* 582 F.3d 672, 678 (7th Cir. 2009); *See Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014) (explaining that the Court has "repeatedly forbidden" ALJs from cherry-picking only the medical evidence that supports their conclusion).

Additionally, the ALJ reasoned that Dr. Jafry was not credible because claimant only saw her a few times and primarily for medication therapy.  While there are no

additional medical records for Dr. Jafry following the August 2010 letter in the administrative record, claimant testified that she still saw her every few months, or more if needed.  The ALJ did not comment on this statement in his assessment.  Moreover, claimant testified that she was encouraged to seek additional therapy, but she could not due to her finances.  The Seventh Circuit has held that the ALJ must first consider the reasons for lack of treatment before drawing a negative inference.  *Craft v. Astrue,* 539 F.3d 668, 679 (7th Cir. 2008).  Courts have also determined that the inability to afford treatment constitutes a good reason for not receiving it.  *See, e.g. SSR 96*-7p, 1996 WL 374186, at * 8; *Shauger v. Astrue,* 675 F.3d 690, 696 (7th Cir. 2012).  The ALJ, however, never considered the reasons and assumed that claimant must be exaggerating her mental health problems.  Consequently, we remand this matter to the ALJ for review consistent with this Court's finding.

### D.    The ALJ's Credibility Determination is Not Supported by Substantial Evidence.

Claimant further argues that the ALJ's assessment contained unsupported credibility determinations.  She also asserts that the ALJ failed to present a complete hypothetical to the VE, leading to an erroneous RFC assessment.  The Commissioner responds that substantial evidence supports the ALJ's credibility determination and RFC findings.  We agree with the claimant that the ALJ's credibility determination was improper, which then impacted his RFC assessment.

To succeed on the credibility ground, claimant must overcome the highly deferential standard that we accord credibility determinations.  *See Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).  We will reverse an ALJ's credibility determination only if the claimant can show that it was "patently wrong." *Id.*  However, although judicial

review of the decisions of administrative agencies is deferential, it is not abject.  *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (quoting *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002)).  The Court cannot uphold an administrative decision that, because of contradictions or missing premises, "fails to build a logical bridge between the facts of the case and the outcome."  *Parker*, 597 F.3d at 921 (quoting *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009)).

Under SSR 96-7p, "the ALJ's assessment of the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on [her] ability to function must be based on a consideration of all the evidence in the case record," including "medical signs and laboratory findings."  SSR 96-7p at *5; *Unger v. Barnhart*, 507 F. Supp. 2d 929, 941 (N.D.Ill. 2007).  Though the ALJ went beyond providing only disfavored boilerplate language, *see Bjornson v. Astrue,* 671 F.3d 640, 644-45 (7th Cir. 2012), the additional reasons he provided for discrediting Hejka's complaints are unsupported by the record or are otherwise flawed.

In this case, the ALJ found that the claimant's medically determinable impairments could reasonably be expected to cause her alleged symptoms; however, he opined that the claimant's statements regarding the "intensity, persistence and limiting effects of these symptoms [were] not credible to the extent they [were] inconsistent" with the RFC.  (R. 17-18.)  In reaching this conclusion, the ALJ failed to consider the numerous reports that corroborated Hejka's symptoms of depression and anxiety.  When describing claimant's history of depression and anxiety, the ALJ only noted that many of her issues were related to her divorce and that later records revealed an improved or stabilized mood.  (R. 18.)  Based on those statements, the ALJ

found that claimant's testimony contradicted her condition and capabilities. (*Id.*) The ALJ cited to numerous comments from claimant's Activities of Daily Living report from June 22, 2010, comparing them with what were deemed to be inconsistent statements from her July 8, 2011 testimony. (R. 18-19.) A majority of the so-called inconsistent statements were with respect to claimant's ability to shop, prepare meals, and hold employment. (*Id.*) Additionally, the ALJ took issue with claimant's receipt of unemployment benefits, which implied that she was able to work. (R. 19.)

The Seventh Circuit has addressed cases in which the claimant is denied benefits because of credibility issues. *Parker*, 597 F.3d at 921-22; *Spiva v. Astrue*, 628 F.3d 346 (7th Cir. 2010). In *Spiva*, the ALJ had based his opinion on a doctor who had originally claimed Spiva might be "malingering," but later decided he was not. *Id.* at 351. Judge Posner mentioned that "nothing in the treatment notes suggested that Spiva was being deliberately or strategically vague or evasive" and that the nature of Spiva's affliction was likely to result in vague statements. *Id.* He concluded that the ALJ's assessment of Spiva's lack of credibility was not founded and remanded the case. *Id.*

In this case, the ALJ based his credibility determination on select statements that appeared inconsistent with statements provided at other times, sometimes over a year later. The claimant testified in July 2011, almost a year after she was evaluated by the State agency consultant. In her testimony, she addressed some of the inconsistencies, remarking that her ability to perform daily activities had worsened since she filled out the June 2010 report.

Notably, the ALJ ignored the State's own consultant's assessment that she was credible. Dr. Heinrich documented that "her allegations were supported by available evidence [and] [h]er statements were taken as credible." (R. 275.) Nowhere in the medical records or interviews does anyone question claimant's credibility. Her treaters adjusted her medications as necessary without question, and she was encouraged to seek further treatment. Yet, the ALJ determined that she was not a credible witness and would not consider her statements regarding the intensity, persistence, or limiting effects of her symptoms.

Additionally, the ALJ failed to consider that symptoms wax and wane, potentially becoming more debilitating as time progressed. *See Roddy v. Astrue*, 705 F.3d 631 (7th Cir. 2013) (finding that the ALJ erred by considering activities as inconsistent and failing to properly consider that the claimant's condition had deteriorated in the interim); *see also Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000) (finding that the ALJ failed to properly consider claimant's deteriorating condition). Instead, the ALJ relied on the records that cited her divorce as a main cause of her depression as well as records indicating that she felt better at certain appointments. The fact that the claimant was on medication for depression and anxiety for 17 years prior to her divorce was never acknowledged. The ALJ formed his own opinion that the claimant's condition was not as debilitating once she proceeded with her divorce without any medical records to support his conclusion. The ALJ's belief that the claimant was not credible is not consistent with the medical records or testimony. As previously noted, the ALJ cannot selectively consider various treatment notes from the record without taking all of the records into consideration. *See Myles,* 582 F.3d at 678.

Moreover, the ability to do minimal daily activities does not necessarily discredit a claimant's credibility, nor does it imply the ability to work full-time. The ALJ cited to claimant's daily activities, such as caring for her disabled daughter, and being able to do the dishes, vacuum, and do laundry as reasons for denying disability benefits. Notably, the ALJ's citation to claimant's caretaking of her disabled daughter is from a medical record before the May 1, 2009 date of onset, and the ALJ did not comment on the fact that the daughter's disability appeared to be a truancy problem and that she lived with her father at the time of claimant's testimony. Further, the Seventh Circuit has repeatedly cautioned ALJs of placing too much weight on daily activities and of ignoring the difference between performing household chores and maintaining full-time employment. *Hughes v. Astrue*, 705 F.3d 276, 278 (7th Cir. 2013) ("We have remarked the naiveté of the Social Security Administration's administrative law judges in equating household chores to employment."). Here, in addition to placing a great deal of weight on Hejka's daily activities, the ALJ also ignored how she performed those activities. There are repeated statements in the record that she lived with her father or sister and depended on her father for help with her day-to-day tasks.

With respect to the ALJ's issue with claimant's collection of unemployment, the Seventh Circuit has noted that claimants may seek unemployment benefits because they are desperate and have no other source of income. *See Gentle v. Barnhart,* 430 F.3d 865, 867 (7th Cir. 2005); *Richards v. Astrue,* 370 Fed. Appx. 727, 731 (7th Cir. 2010). While it is appropriate for the ALJ to consider representations claimant made about an ability to work, here, the ALJ did not consider all the factors that led Hejka to seek unemployment. Records show that claimant was stressed due to finances and

was also trying to separate from her mentally abusive husband while unemployed. She also testified about being unable to afford additional therapy. The ALJ should have at least considered these factors as part of his credibility determination.

Claimant further argues that the ALJ made an improper RFC assessment by failing to incorporate all of claimant's limitations. The RFC is the most a claimant can still do despite her limitations. 20 C.F.R. § 416.945(a)(1). In making the RFC determination, the ALJ will consider all of the relevant medical and other evidence in the record, including evidence of impairments that are not severe. 20 C.F.R. § 416.945(a)(3); *Craft*, 539 F.3d at 676. The RFC assessment must contain a narrative discussion describing how the evidence supports the ALJ's conclusions and explaining why any medical source opinion was not adopted if the ALJ's RFC assessment conflicts with such an opinion. SSR 96-8p, 1996 WL 374184, at **5, 7; *accord Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). A court will uphold an ALJ's decision "if the evidence supports the decision and the ALJ explains his analysis of the evidence with enough detail and clarity to permit meaningful review." *Arnett v. Astrue*, 676 F.3d 586, 591-92 (7th Cir. 2012) (*citing Eichstadt v. Astrue*, 534 F.3d 663, 665-66 (7th Cir. 2008)). "Although an ALJ need not mention every snippet of evidence in the record, the ALJ must connect the evidence to the conclusion; in so doing, he may not ignore entire lines of contrary evidence." *Arnett*, 676 F.3d at 592.

Here, the ALJ found that the claimant had the RFC to perform a full range of work at all exertional levels, but that she had a number of non-exertional limitations. While the ALJ is not required to discuss every piece of evidence in the record, the ALJ must connect the evidence to the conclusion. *See Arnett*, 676 F.3d at 592. Claimant

argues that the ALJ failed to adequately assess claimant's RFC using all of her limitations. Specifically, claimant testified to regular panic and anxiety attacks that limited her ability to function. The ALJ stated that he did not consider Hejka's alleged inability to sustain concentration, persistence or pace at the 85 percent level because he did not find any basis for such a limitation based on the claimant's record. As discussed above, the ALJ improperly assessed claimant's credibility and did not properly consider Dr. Jafry's records. Therefore, the ALJ admittedly did not take certain factors into consideration when determining the claimant's RFC and should more fully consider the claimant's RFC on remand.

## III. CONCLUSION

For the reasons set forth above, claimant's motion for summary judgment is granted. This case is remanded to the Social Security Administration for further proceedings consistent with this order. It is so ordered.

**ENTERED:**

_____
**Michael T. Mason**
**United States Magistrate Judge**

**Dated: October 22, 2015**